FILED
United States Court of Appeals
Tenth Circuit

July 22, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

Plaintiff - Appellant,

v.

No. 07-1148

LINDA CARNAGIE and STAFFORD
A. HILAIRE,

Defendants - Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D. Ct. No. 04-CR-00463-MSK)

---

Patricia W. Davies, Assistant United States Attorney (Troy A. Eid, United States
Attorney, and Martha A. Paluch, Assistant United States Attorney, with her on the
briefs), Office of the United States Attorney for the District of Colorado, Denver,
Colorado, appearing for Appellant.

Patrick D. Butler, Lamm & Butler, LLC, Louisville, Colorado, appearing for
Appellee Carnagie.

Peter Menges, The Law Office of Peter D. Menges, P.C., Denver, Colorado,
appearing for Appellee Hilaire.

---

Before **HENRY**, Chief Circuit Judge, **TACHA**, and **BRISCOE**, Circuit Judges.

---

**TACHA**, Circuit Judge.

Following a jury trial, Defendants-Appellees Linda Carnagie and Stafford

Hilaire were found guilty of conspiracy to defraud the United States, *see* 18

U.S.C. § 371, and conspiracy to commit money laundering, *see* 18 U.S.C. §

1956(a)(1)(A)(i), (h).  The district court granted the defendants' motion for

judgment of acquittal, holding that the evidence adduced at trial failed to prove

the conspiracies as charged and, instead, proved a number of smaller, separate

conspiracies.  The government appeals.  We exercise jurisdiction under 28 U.S.C.

§ 1291 and REVERSE and REMAND.

## I. BACKGROUND

A.    Factual History

In reciting the facts of this case, we view the evidence in the light most

favorable to the jury's verdict.  *See United States v. Ortiz*, 427 F.3d 1278, 1281

(10th Cir. 2005).  In 1997, Roderick Wesson and Warren Williams registered a

sham company, W & W Enterprises, with the State of Colorado in order to use the

company's name to generate false financial documents—mainly, W-2s and pay

stubs.  For a fee, Mr. Wesson and Mr. Williams would provide that false

documentation, along with fake social security numbers, to persons with bad or no

credit to help them purchase a home.[1]  The goal was to help unqualified borrowers

obtain home loans insured by the Federal Housing Administration ("FHA") by

[1]Although the record is unclear as to when they were established, Mr. Wesson and Mr. Williams also used two other fictitious businesses (Comp Systems and Neighborstat Incorporated) to create fake W-2s and pay stubs.

using the false financial information and documents.

By way of background, the FHA is a branch of the Department of Housing and Urban Development ("HUD") that insures certain loans for single-family homes. If a loan applicant qualifies for FHA insurance, HUD insures the lender against any loss it may incur in the event of foreclosure. FHA-insured loans also require a lower down payment and a less stringent debt-to-income ratio than non-FHA-insured loans. HUD must approve a lender before it can offer FHA-insured loans. When processing a particular loan to determine whether the FHA will insure it, an approved lender requests an FHA case number by entering the lender's institutional ID and password on an FHA website. The lender also enters various information pertaining to the home buyer's credit history and ability to make payment. The loan officer is responsible for collecting supporting documentation from the borrower and verifying the accuracy of this information through third parties.

Mr. Williams and Mr. Wesson found it more efficient and profitable, because they could charge kickbacks, to work with cooperating real estate agents and loan officers when completing these fraudulent loan applications. The details of their scheme can be summarized as follows. Document makers (typically Mr. Williams or Mr. Wesson) or real estate agents would find clients and provide them with false income documents and social security numbers. The loan officer would help the client obtain an FHA-insured loan based on this false information,

and the real estate agent and loan officer would each give twenty percent of their earnings on the sale of the property and the loan closing to the document maker. Mr. Williams and Mr. Wesson completed fraudulent loan transactions together from 1997 until 2000. In 2000, Mr. Wesson and Mr. Williams parted ways and began competing for prospective home buyers. Mr. Wesson and Mr. Williams often worked on different transactions with different loan officers and real estate agents, many of whom did not know the identity of the other real estate agents and loan officers involved in their scheme.

1.      *Transactions Involving Ms. Carnagie*

In October 1999, Ms. Carnagie paid Mr. Wesson $500 for a false social security number and false income and employment documents so she could obtain an FHA-insured loan to purchase her own home. For this transaction, Nina Cameron was the loan officer and Toni Myles was the real estate agent.

After using the false documents to obtain her own home loan, Ms. Carnagie, employed as a loan officer at Highlands Mortgage, began to work with Mr. Wesson and others to fraudulently obtain FHA loans for home buyers. For the fraudulent transactions in which Ms. Carnagie was involved, Mr. Wesson was typically the document maker and either Ms. Myles or Odie Webster was the real estate agent. Ms. Carnagie would advise Mr. Wesson of the amount of false income that should be reported to reach the requisite debt-to-income ratio. In addition, because she was using fake social security numbers that often had no

credit history, Ms. Carnagie would occasionally have to create false credit letters to obtain an FHA loan. Once the false financial documents were created and the buyer selected a home, Ms. Carnagie would provide the information to someone at Highlands Mortgage who would enter it into the FHA system. After the FHA approved the loan and Ms. Carnagie closed on the home, she would pay Mr. Wesson twenty percent of the commission she received from the sale.

Between February and September 2000, Ms. Carnagie helped procure approximately sixteen loans that were insured by the FHA based on fraudulent information. Later the same year, Highland Mortgage discovered the fraudulent nature of many of her loan transactions and took steps that prevented her from submitting any further loan applications through Highland Mortgage. Ms. Carnagie did not complete any of these transactions with Mr. Hilaire (her codefendant), or even know him prior to these proceedings, and nothing in the record indicates she knew or had any dealings with Mr. Williams.[2]

2. *Transactions Involving Trenson Byrd*

For his part, Mr. Williams had been working with (among others) Linda Edwards, a real estate agent with Affable Realty. After completing several fraudulent transactions with her, Mr. Williams expressed his interest in obtaining

---

[2]Although Ms. Carnagie's transactions occurred before Mr. Williams and Mr. Wesson became direct competitors, Mr. Williams was not present when Mr. Wesson met with Ms. Carnagie and was not aware of the nature of their arrangement. He further testified that he was not a direct participant in these transactions.

a position as a loan officer and thus expanding his role beyond that of a document maker. She set up an appointment for him with Trenson Byrd, the owner of Mid America Mortgage and the third charged coconspirator that proceeded to trial with the defendants. Around September 1999, Mr. Byrd, at Ms. Edwards's recommendation, hired Mr. Williams as a loan officer at Mid America Mortgage. While at Mid America, Mr. Williams created false income documents and social security numbers for buyers and worked with Ms. Edwards to submit them to HUD.

In November 1999, Mr. Byrd noticed an abnormally high number of loan applicants with supporting documentation that listed the same employer, an entity called Neighborstat, which was one of Mr. Williams's and Mr. Wesson's fictitious companies. Mr. Byrd reported his finding to HUD and instructed his staff that Mid America would no longer process loans for Neighborstat employees. Mr. Williams subsequently left Mid America after just a couple months and worked at several other mortgage companies before acquiring a position at Catalina Century Mortgage. Mr. Byrd claimed he did not work with or know Mr. Hilaire or Ms. Carnagie prior to being charged in this case and had never heard of Mr. Wesson.

### 3. *Transactions Involving Mr. Hilaire*

Mr. Hilaire was a loan officer and the vice president of Catalina Century

Mortgage at the time Mr. Williams applied for a position. After interviewing him and receiving a recommendation from Ms. Edwards, Mr. Hilaire hired Mr. Williams as a loan officer in the fall of 2000. Because Catalina Century Mortgage was not approved to offer FHA-insured loans, it provided them through Rocky Mountain Mortgage Specialists, an affiliated company that had FHA approval.

Between November 2000 and May 2001, Mr. Hilaire was involved in thirteen transactions in which fraudulent information was submitted in order to obtain FHA-insured loans. Ms. Edwards was typically the real estate agent and would refer potential buyers to Mr. Hilaire for loan assistance. Several of the buyers testified that, after Ms. Edwards's referral, they met with Mr. Hilaire and discussed using false social security numbers and false documents to obtain a loan. In almost all these transactions, Mr. Williams created the false documents submitted to HUD. Mr. Williams also testified that Mr. Hilaire inquired as to how Mr. Williams came up with his false income figures and that he witnessed Mr. Hilaire creating false pay stubs.

At some point in 2001, Rocky Mountain Mortgage Specialists, the FHA-approved lender that Mr. Hilaire used to obtain FHA-insured loans, became concerned about some of the files Mr. Hilaire had submitted. It hired an investigator to look into the matter and eventually terminated its relationship with Catalina Century Mortgage. Mr. Hilaire did not complete any transactions with

Mr. Byrd and had not heard of Ms. Carnagie or Mr. Wesson prior to being charged in this case.

B.    History of the Case

In September 2001, HUD learned of the fraud after a quality review found loans submitted by a loan officer, Ms. Cameron, were obtained using false social security numbers and W-2s. Further examination revealed that many other transactions involved the same employers (the fake companies) and many of the same real estate agents and loan officers. In February 2004, following the initial investigation, Mr. Wesson, Mr. Williams, and various other alleged coconspirators were separately charged as a result of their involvement in the scheme. Mr. Wesson and Mr. Williams pleaded guilty to conspiracy charges and entered cooperation plea agreements with the government. Due in part to the cooperation of many of those initially charged, a second superseding indictment was presented to the grand jury in February 2005.

The grand jury indicted Ms. Carnagie, Mr. Hilaire, and Mr. Byrd on charges of conspiracy to defraud the United States in violation of 18 U.S.C. § 371 (Count 1) and conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(I), (h) (Count 41). Five other coconspirators were charged in Count 1 and three others in Count 41, but only Ms. Carnagie, Mr. Hilaire, and Mr.

Byrd proceeded to trial.[3]  In addition to the conspiracy charges, Ms. Carnagie and Mr. Hilaire were charged with various other counts of wire fraud, making or using a false document, and using a false social security number.

After the close of the government's evidence at trial, Ms. Carnagie and Mr. Hilaire moved for judgment of acquittal, arguing that the evidence did not establish the existence of the large conspiracies charged in Counts 1 and 41, but proved only multiple, smaller conspiracies.  The district court took the motions under advisement.  The jury then returned its verdict, finding Ms. Carnagie and Mr. Hilaire guilty on both conspiracy charges.  Ms. Carnagie was also found guilty on several of the wire fraud and false document counts.  The jury acquitted Mr. Hilaire of all the individual counts and acquitted Mr. Byrd of the conspiracy counts.  Ms. Carnagie and Mr. Hilaire moved again for judgment of acquittal, making the same arguments they had previously made and contending that a fatal variance occurred between the single, broad conspiracies charged in Counts 1 and 41 and the multiple, smaller conspiracies proven at trial.  The district court granted the motion, concluding the government failed to establish the requisite interdependence among the alleged members of the fraud and money laundering

---

[3]Sandra Lindsey, a home buyer charged with a single count of making or using a false document, was tried with the defendants and found guilty.  The second superseding indictment also charged thirty people in addition to the four that proceeded to trial.  Some of the charges were dismissed, some defendants entered guilty pleas, and the rest—including alleged coconspirators Ms. Edwards, Emmitt Cotton, and LaDonna Mullins—are being tried separately.

conspiracies as charged.  The government now appeals.

## II.  DISCUSSION

The government argues that there was no variance between the conspiracies charged and the evidence adduced at trial, and even if a variance occurred, it was not prejudicial.  Thus, we have two questions to consider on appeal: (1) did the evidence support the overall conspiracies charged, or did a variance occur; and (2) if a variance occurred, was it substantially prejudicial to the defendants?  *See United States v. Windrix*, 405 F.3d 1146, 1153 (10th Cir. 2005).

A.      Variance

A variance arises when an indictment charges a single conspiracy but the evidence presented at trial proves only the existence of multiple conspiracies.  *See United States v. Ailsworth*, 138 F.3d 843, 848 (10th Cir. 1998).  In determining whether a variance occurred that would support the district court's grant of judgment of acquittal, we view the evidence and draw all reasonable inferences therefrom in the light most favorable to the government, asking whether a reasonable jury could have found Ms. Carnagie and Mr. Hilaire guilty of the charged conspiracies beyond a reasonable doubt.  *See United States v. Montgomery*, 468 F.3d 715, 719 (10th Cir. 2006); *Ailsworth*, 138 F.3d at 846; *see also United States v. Griffin*, 493 F.3d 856, 862 (7th Cir. 2007) ("We treat a conspiracy variance claim as an attack on the sufficiency of the evidence supporting the jury's finding that each defendant was a member of the same

-10-

conspiracy.").

In this case, the government charged the defendants with conspiring to defraud the United States (Count 1) and conspiring to commit money laundering (Count 41). Count 1 of the second superseding indictment charged the defendants as follows:

> From on or about February 2, 1999, and continuing thereafter until on or about July 26, 2004 . . . [Ms. Carnagie, Ms. Cameron, Ms. Edwards, Ms. Mullins, Mr. Byrd, Mr. Cotton, Mr. Hilaire, and Mr. Webster] did conspire together and with others both known and unknown to the Grand Jury . . . to commit offenses against the United States, that is, [making or using a false writing or document] and [using a false social security number].

Count 41, the money laundering conspiracy count, centered on the kickbacks paid by various loan officers and real estate agents after a deal closed. It alleged:

> Beginning on or about February 2, 1999, and continuing through December 30, 2002 . . . [Ms. Edwards, Ms. Carnagie, Mr. Byrd, Mr. Hilaire, and Mr. Cotton] conspired and agreed together and with each other, and with other persons both known and unknown to the Grand Jury, to conduct and attempt to conduct financial transactions, knowing that the property involved in the said financial transactions represented the proceeds of some form of unlawful activity, namely, proceeds from schemes to commit wire fraud, with the intent to promote the carrying on of the specified unlawful activity, namely the wire fraud.

In order to prove the defendants are guilty of these conspiracies, the government had to show "(1) that two or more persons agreed to violate the law [defrauding the United States and committing money laundering], (2) that the

-11-

defendant[s] knew at least the essential objectives of the conspiracy, . . . (3) that the defendant[s] knowingly and voluntarily became a part of it, and (4) that the alleged coconspirators were interdependent." *United States v. Sells*, 477 F.3d 1226, 1235 (10th Cir. 2007) (quotations omitted). Of particular importance here is whether the coconspirators were interdependent. Interdependence requires that a defendant's actions "facilitate the endeavors of other alleged coconspirators or facilitate the venture as a whole." *United States v. Evans*, 970 F.2d 663, 670 (10th Cir. 1992) (quotation and alterations omitted). "What is needed is proof that [the coconspirators] intended to act *together* for their *shared mutual benefit* within the scope of the conspiracy charged." *Id.* at 671.

The government's theory at trial was that Mr. Wesson and Mr. Williams were the central figures in a single scheme that encompassed both of the conspiracies charged in the superseding indictment. The government characterized that scheme as its own "wheel" conspiracy with Mr. Williams and Mr. Wesson at the hub and the various loan officers and real estate agents constituting the spokes. In their motions for judgment of acquittal, the defendants argued that the proof at trial was insufficient to prove large, global conspiracies and instead proved several smaller conspiracies, which were all independent of each other. These smaller conspiracies included one with Mr. Wesson at the center, with Ms. Carnagie and certain real estate agents as the spokes, and one with Mr. Williams at the center, with Mr. Hilaire and other real estate agents as

-12-

the spokes. We agree with the district court and the defendants that this is what the evidence established.

The government contends that it established interdependence by presenting evidence of a unified and shared objective of closing "as many fraudulent FHA loans as possible." According to the government, this shared objective was the rim connecting the various loan officers and real estate agents who participated with Mr. Wesson or Mr. Williams in otherwise unrelated transactions.[4] *See United States v. Daily*, 921 F.2d 994, 1007 (10th Cir. 1990) ("[T]he focal point of the [interdependence] analysis is whether the alleged co-conspirators were united in a common unlawful goal or purpose."), *overruled on other grounds by United States v. Gaudin*, 515 U.S. 506 (1995). This common goal, however, is not by itself enough to establish interdependence: "What is required is a *shared*, single criminal objective, not just similar or parallel objectives between similarly

---

[4]The district court suggested that the government's contention at trial that all the defendants were involved in a single, overarching scheme was inconsistent with the second superseding indictment, which charged two conspiracies. As the government explained, and as the defendants appeared to recognize, however, the indictment charged the defendants with conspiring together to commit two different substantive offenses, defrauding the United States and money laundering, rather than separately charging smaller conspiracies with the same two offenses. The government's assertion at trial that the rim connecting the various players was the objective of closing as many FHA loans as possible is not "a completely different theory" from that contained in the indictment; rather, it was merely the government's explanation for how the various players were interconnected and could thus be charged together for their involvement in a single criminal enterprise (involving two criminal offenses), as opposed to separate and distinct ones.

situated people." *Evans*, 970 F.2d at 671.  Although the Wesson-Carnagie group and the Williams-Hilaire group had the same general objective—to profit from submitting fraudulent FHA loans—it does not necessarily mean that the separate groups were interdependent.

To begin, Mr. Hilaire did not even know Ms. Carnagie or Mr. Wesson, much less interact with them.  Likewise, Ms. Carnagie never completed a transaction with Mr. Williams, and she did not know Mr. Hilaire.  Moreover, the record does not show that, besides those individuals with whom they completed transactions, Ms. Carnagie or Mr. Hilaire knew about other loan officers and real estate agents with whom Mr. Wesson and Mr. Williams were completing similar transactions.  We recognize that the government "does not have to show the defendant knew all the details or all the members of a conspiracy." *United States v. Yehling*, 456 F.3d 1236, 1240 (10th Cir. 2006).  It must prove, however, that Ms. Carnagie and Mr. Hilaire knowingly agreed to participate in a conspiracy of the magnitude alleged in the indictment—not just that they knowingly agreed to participate in *a* conspiracy.[5]

_____

[5]In this way, we agree with the district court's conclusion that there is a difference in the proof necessary to establish interdependence in a drug conspiracy from that necessary to link parallel financial transactions such as the ones in this case.  As the district court reasoned, because the manufacture, sale, and use of drugs is illegal, essentially every aspect of the drug distribution business is illegal.  Each participant is presumptively aware of the illegal nature of the activity and of the existence of the illegal venture.  As a result, we have said that "where large quantities of narcotics are being distributed, each major

(continued...)

In addition, the Williams-Hilaire transactions in no way benefitted from or depended upon the success of the Wesson-Carnagie transactions, and vice versa. *See id.* at 1241 ("[E]ach coconspirator's actions must facilitate the endeavors of other alleged coconspirators or facilitate the venture as a whole." (quotation omitted)); *Daily*, 921 F.2d at 1007 ("[O]f principal concern is whether the activities of alleged co-conspirators in one aspect of the charged scheme were necessary or advantageous to the success of the activities of co-conspirators in another aspect of the charged scheme, or the success of the venture as a whole."). The different groups engaged in similar transactions for similar reasons, but there was no showing of mutual dependence between them. The Wesson-Carnagie group was completely dissolved by the time Mr. Hilaire started working with Mr. Williams, and at the time Mr. Hilaire allegedly participated in fraudulent

---

[5](...continued)
buyer may be presumed to know that he is part of a wide-ranging venture, the success of which depends on performance by others whose identity he may not even know," and "evidence that a defendant is a major supplier of drugs is sufficient to infer knowledge of the broader conspiracy." *United States v. Small*, 423 F.3d 1164, 1183 (10th Cir. 2005). In other words, interdependence in a drug conspiracy may stem from the illegal nature of the drug trade itself.

In contrast, selling real estate and obtaining loans for those sales is generally lawful. Unlawful activity, however, may occur as part of those otherwise lawful transactions—in this case, for example, the use of false documents or social security numbers to secure financing. In this situation, because the underlying transaction is generally lawful, one cannot infer an illegal common purpose in the same way that a common purpose could be found in a drug conspiracy. Instead, interdependence must be proved more precisely. The government must do more than prove that a defendant participated in a real estate transaction involving false documentation to demonstrate interdependence; it must show that each defendant's actions benefitted the common venture.

transactions, Mr. Williams and Mr. Wesson were in direct competition for prospective borrowers. *See United States v. Harrison*, 942 F.2d 751, 757 (10th Cir. 1991) (stating that because two drug suppliers were in direct competition with each other, their activities "were not advantageous to the success of other sources nor were they essential and integral steps toward the realization of a *common* illicit goal" (quotations omitted)). Any success realized by the Williams-Hilaire group, therefore, decreased the pool of potential borrowers for Mr. Wesson.

In *Kotteakos v. United States*, 328 U.S. 750, 754–55 (1946), several groups of defendants submitted fraudulent loans, none of which had any connection to the other except that each dealt independently with the same agent. The Court made clear that under those circumstances there must be some overlap among the spokes to establish interdependence. Therefore, the mere fact that Ms. Carnagie and Mr. Hilaire worked with Mr. Wesson and Mr. Williams, who happened to be connected to each other and constituted the hub of the wheel, does not establish interdependence. *See id.* (holding that there was no connection among "separate spokes meeting at a common center" and thus no single conspiracy without "the rim of the wheel to enclose the spokes"); *Evans*, 970 F.2d at 670 ("[A] single conspiracy does not exist solely because many individuals deal with a common central player; they must be interconnected in some way.").

For all these reasons, we cannot conclude that the evidence supports broad

-16-

conspiracies to defraud the United States and to launder money whereby Ms. Carnagie and Mr. Hilaire acted "together" for their "shared mutual benefit." Accordingly, we conclude that Ms. Carnagie and Mr. Hilaire were not interdependent coconspirators, and thus, the government failed to prove the two widespread conspiracies charged in the indictment.

B.    Prejudice

A variance between the indictment and the proof is only reversible error, however, if it is prejudicial—that is, if it "affects 'the substantial rights of the accused.'" *United States v. Edwards*, 69 F.3d 419, 433 (10th Cir. 1995) (quoting *Berger v. United States*, 295 U.S. 78, 82 (1935)).  We review de novo the question of whether a variance was prejudicial.  *United States v. Williamson*, 53 F.3d 1500, 1512 (10th Cir. 1995).  The defendants contend that the presentation of evidence concerning the separate conspiracies in this case adversely affected their substantial rights because: (1) the second superseding indictment did not put them on adequate notice of the charges brought against them; and (2) they were found guilty based on evidence introduced against other alleged coconspirators, which the jury imputed to the defendants.

*1.    Notice*

A variance can prejudice a defendant's Sixth Amendment right to notice of the charges against him if he "could not have anticipated from the allegations in the indictment what the evidence would be at trial."  *United States v. Stoner*, 98

F.3d 527, 536 (10th Cir. 1996). Here, we fail to see how the defendants can claim that there was "simply no way to anticipate" what evidence would be offered against them at trial. The conspiracy charges in the indictment recited every transaction that the government was relying on to support its case.

Moreover, even though the evidence did not establish two large conspiracies, it was clearly sufficient to prove that Ms. Carnagie conspired with Mr. Wesson and the various real estate agents with whom she completed transactions, as well as that Mr. Hilaire conspired with Mr. Williams and other real estate agents. When a narrower scheme than the one alleged is fully included within the indictment and proved, we have repeatedly held that a defendant's substantial rights are not prejudiced. *See Windrix*, 405 F.3d at 1154 ("A defendant's substantial rights are not prejudiced merely because the defendant is convicted upon evidence which tends to show a narrower scheme than that contained in the indictment, provided that the narrower scheme is fully included within the indictment."); *Ailsworth*, 138 F.3d at 849 (holding that while evidence proving conspiracy was narrower than the conspiracy alleged in the indictment, the variance was not fatal because the "government did not offer proof of new facts or new offenses not alleged in the indictment"). Here, all the acts that made up the distinct conspiracies were set out in the indictment (the government did not introduce any new evidence at trial), and the defendants knew the transactions were "part and parcel" of the overall conspiracies alleged in Counts 1 and 41. *See*

-18-

*Ailsworth*, 138 F.3d at 850. Because the defendants could anticipate the trial evidence, they cannot reasonably contend they were not given adequate notice of the charges against them.

### 2.    *Guilt Transference*

A variance can also prejudice a defendant's substantial rights "if the evidence adduced against co-conspirators involved in separate conspiracies was more likely than not imputed to the defendant by the jury in its determination of the defendant's guilt." *Windrix*, 405 F.3d at 1154 (citation and alteration omitted); *see also Harrison*, 942 F.2d at 758 (noting that a variance is substantially prejudicial if "the evidence adduced against the co-conspirators involved was more likely than not imputed to the defendant by the jury in its determination of the defendant's guilt" (quotation omitted)).

In determining whether there was a "prejudicial spillover effect" from evidence pertaining to conspiracies not involving the defendant, we generally focus on three questions:

> "*First*, whether the proliferation of separate crimes or conspiracies presented in the case impaired the jury's ability to segregate each individual [conspirator's] actions and the evidence associated with [her or] his participation; *Second*, whether confusion among members of the jury concerning the legal limitations on the use of certain evidence resulted from the variance; and, *Third*, the strength or weakness of the evidence underlying the jury's conviction."

*Id.* (quoting *United States v. Morris*, 623 F.2d 145, 149 (10th Cir. 1980)) (alterations in original). We address each in turn.

In *Kotteakos*, the Supreme Court emphasized that "[n]umbers are vitally important in trial, especially in criminal matters." 328 U.S. at 772. The defendants argue that here, as in *Kotteakos*, the number of defendants indicted and tried and number of conspiracies proven increased the probability that prejudice would result. In *Kotteakos*, thirty-two persons were indicted for conspiracy, nineteen defendants were tried together, thirteen names were submitted to the jury, and at least eight separate conspiracies were proven. *Id.* at 753; *cf. Berger*, 295 U.S. at 80, 84 (holding no prejudice when four defendants were tried for single conspiracy and two separate conspiracies proved). Here, while thirty-four persons were indicted (including eight persons for the conspiracy alleged in Count 1 and six persons for the conspiracy alleged in Count 41), only three defendants charged with conspiracy were tried together, and at most, three conspiracies were proven.[6] While this is more than in *Berger*, the number of defendants tried and conspiracies proven do not reach the magnitude of *Kotteakos*, and thus the risk of prejudice is not as great. *See Kotteakos*, 328 U.S. at 774 (expressing no opinion on "what marks the limit," but making clear that it exists somewhere between *Berger* and *Kotteakos*). Moreover, in addition to the

_____

[6]The evidence in this case was sufficient to establish one conspiracy involving Mr. Wesson, Ms. Carnagie, and several real estate agents (e.g., Ms. Myles, Ms. Webster); one conspiracy involving Mr. Williams, Mr. Hilaire, and real estate agents (e.g., Ms. Edwards); and, at least arguably, one involving Mr. Williams, Mr. Byrd, and various real estate agents. Of course, the jury acquitted Mr. Byrd of the conspiracy charges, and we do not call that verdict into question here.

fact that this case involves fewer defendants and conspiracies, several other factors militate against concluding that the evidence impaired the jury's ability to distinguish among separate conspiracies.[7]

We note at the outset that the defendants have not identified any specific instances of evidentiary spillover. They merely allege that they were exposed to a general risk of guilt transference from the evidence presented against other coconspirators involved in separate conspiracies. The evidence in this case, however, was "not so intricate as to render the jury unable to segregate the evidence associated with each defendant's individual actions." *See Edwards*, 69 F.3d at 433.

First, the evidence offered tended to prove the existence of three separate and distinct conspiracies: Wesson-Carnagie, Williams-Byrd, and Williams-Hilaire. While the jury heard evidence of many fraudulent transactions, the evidence implicating the defendants in their respective conspiracies was relatively simple. It consisted of testimony concerning the defendants' involvement, as well as loan documentation for each transaction. All three defendants worked for different lenders on unrelated transactions involving different home and they did not even know each other. Under these circumstances, the jury could easily have

_____

[7]We express no opinion as to whether any of these factors, taken by themselves, would be sufficient to find that no prejudice occurred. Taken together, however, we are confident that the defendants' substantial rights were not affected.

-21-

separated the evidence associated with Ms. Carnagie, Mr. Hilaire, and Mr. Byrd.

Second, all the transactions not involving Ms. Carnagie and Mr. Hilaire were of the exact same character as the transactions in which they allegedly participated. We have held that such a similarity between different transactions cuts against a finding of substantial prejudice. *See Morris*, 623 F.2d at 150 ("The similarity of the challenged transactions not involving [the defendant] directly militates against our finding significant prejudice."); *see also United States v. Levine*, 569 F.2d 1175, 1177 (1st Cir. 1978) ("[T]he prejudice should be minimized by the fact that those transactions not directly involving appellant were of the same character as the ones that did involve him."). In addition, Mr. Byrd, Ms. Carnagie, and Mr. Hilaire were alleged to have played the same role—that of loan officer—and were "charged with conduct of approximately equal culpability." *See United States v. Caver*, 470 F.3d 220, 237 (6th Cir. 2006). Thus, as in *Caver*, "this was not a case where a defendant with a relatively minor role was forced to endure an extended trial where the bulk of the evidence did not pertain to him." *Id.*

Finally, the jury actually demonstrated that it could compartmentalize the evidence associated with each defendant and not transfer the guilt of some alleged coconspirators to all because it acquitted Mr. Hilaire of the underlying counts and acquitted Mr. Byrd of the conspiracy. *See Windrix*, 405 F.3d at 1155 ("The jury's capacity to distinguish among the codefendants is demonstrated by its acquittal of

[a] codefendant . . . on all counts at the very trial at which Defendants were convicted.").

Next, we consider "whether confusion among members of the jury concerning the legal limitations on the use of certain evidence resulted from the variance." Mr. Hilaire contends that the jury's verdicts were "inconsistent" and "illogical" because he was acquitted of the wire fraud counts but found guilty of the conspiracy counts. But the government did not have to prove that *he* committed an overt act, so long as it proved he conspired with Mr. Williams and other real estate agents and one of them committed an overt act in furtherance of the conspiracy. *See United States v. Pursley*, 474 F.3d 757, 768 (10th Cir. 2007); *see also United States v. Kendall*, 766 F.2d 1426, 1431 (10th Cir. 1985) ("The conspiracy is complete when one or more of the conspirators knowingly commit an act in furtherance of the object of the agreement." (quotation omitted)). Further, even though the government only had to prove that one of the members committed an overt act in furtherance of the conspiracy, it presented evidence of overt acts committed by Mr. Hilaire himself; for example, Mr. Williams testified that he witnessed Mr. Hilaire creating false pay stubs.

The limiting instruction given by the district court also minimized any possible prejudice. *See Edwards*, 69 F.3d at 433. The court specifically instructed the jury:

You must independently consider whether the Government has

-23-

proven the guilt of each defendant on each offense charged.  This means that you must consider the evidence as to each offense charged against a defendant, without considering the evidence pertaining to the other offenses charged against that defendant.  Similarly, you must consider the evidence against each defendant, separately.  Your verdict as to one defendant should not influence your verdict as to any other.

As we generally assume that jurors follow the judge's instructions, *see United States v. Chanthadara*, 230 F.3d 1237, 1251 (10th Cir. 2000), we conclude that there was no prejudice from jury confusion.

Finally, the jury heard ample evidence to convict both Ms. Carnagie and Mr. Hilaire of the smaller, separate conspiracies.  Mr. Wesson and Mr. Williams testified extensively concerning Ms. Carnagie's and Mr. Hilaire's involvement and knowledge of the scheme, and their testimony was corroborated by home buyers and real estate agents.[8]

In sum, the defendants have failed to demonstrate that the indictment did not give them adequate notice of the crimes charged or that the jury imputed to them evidence of the conspiracies that did not involve them.  We conclude that if the variance influenced the jury, it "had but very slight effect."  *See Kotteakos*, 328 U.S. at 764.  Accordingly, even though a variance occurred, the defendants did not suffer substantial prejudice as a result.

---

[8]Mr. Hilaire also raises a sufficiency of the evidence challenge as to the smaller conspiracy, but as we have stated, the evidence was more than sufficient to permit a finding that he knowingly agreed to join a conspiracy with Mr. Williams.  Ms. Carnagie does not make a similar argument.

## III.  CONCLUSION

For the foregoing reasons, we REVERSE and REMAND for further proceedings not inconsistent with this opinion.

07-1148, *United States v. Carnegie, et al.*

**HENRY**, Chief Judge, concurring:

I join the majority's careful opinion but write separately to note the closeness of this case. In *United States v. Evans*, 970 F.3d 663, 674 (10th Cir. 1992), we observed, "The tactic of charging many defendants with a single massive conspiracy is fraught with the potential for abuse." Here, apparently undaunted by a paucity of evidence supporting its theory that a single, massive wheel conspiracy existed, the government chose to prosecute Ms. Carnagie and Mr. Hilaire together. In my view, the government's presentation of evidence at trial came dangerously close to *Evans*'s concern that the jury would be "so overwhelmed with evidence of wrongdoing by other alleged coconspirators that it [would] fail to differentiate among particular defendants." *Id.*

However, I am persuaded by the majority opinion's conclusion that Ms. Carnagie and Mr. Hilaire were not substantially prejudiced by the joint prosecution. In particular, I agree that they were adequately informed of the charges against them. *See United States v. Windrix*, 405 F.3d 1146, 1154 (10th Cir. 2005) ("A defendant's substantial rights are not prejudiced merely because the defendant is convicted upon evidence which tends to show a narrower scheme than that contained in the indictment, provided that the narrower scheme is fully included within the indictment."). Moreover, my review of the record does not lead me to conclude that guilt was more likely than not imputed from one defendant to another. *See id.* (observing that substantial prejudice has occurred

"if the evidence adduced against co-conspirators involved in separate conspiracies was more likely than not imputed to the defendant by the jury in its determination of the defendant's guilt") (quoting *United States v. Harrison*, 942 F.2d 751, 758 (10th Cir. 1991) (internal quotation marks omitted). Rather, the jury was presented with evidence that tended to show Ms. Carnagie and Mr. Hilaire's involvement in smaller conspiracies, which were distinct from the massive conspiracy alleged, and the district court properly instructed the jury to separately consider the evidence against each defendant. Thus, I concur.