**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 10, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

PUBLISH

UNITED STATES COURT OF APPEALS

TENST CIRCUIT

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JOSE MANUEL MARQUEZ
SANCHEZ, also known as Adan,

Defendant - Appellant.

No. 19-6034

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. NO. 5:17-CR-00122-SLP-6)**

---

Ty Gee, Haddon, Morgan and Foreman, P.C., Denver, Colorado, for Appellant.

Steven W. Creager, Assistant United States Attorney (Timothy J. Downing, United States Attorney, and Ashley L. Altshuler, Assistant United States Attorney, with him on the brief), Office of the United States Attorney, Oklahoma City, Oklahoma, for Appellee.

---

Before **TYMKOVICH**, Chief Judge, **BRISCOE**, and **MATHESON**, Circuit Judges.

---

**TYMKOVICH,** Chief Judge.

---

This case arises out of an eighteen-month long investigation into a conspiracy to distribute large volumes of methamphetamine in the Oklahoma City area. The investigation culminated in a 125-count indictment charging ten individuals, including Sanchez, with a variety of federal drug-related crimes. A jury convicted Sanchez of ten offenses relating to a conspiracy to possess with intent to distribute methamphetamine. On appeal, Sanchez argues we should reverse his conviction because a fatal variance existed between the conspiracy charged and the evidence presented at trial. In his view, while he bought drugs from members of the conspiracy on occasion, the evidence does not show that he participated in the overarching drug conspiracy. He also objects to the quantity of drugs that the district court attributed to him at sentencing.

We affirm the judgment of the district court because, even assuming Sanchez is correct that a variance occurred here, it was not fatal. The evidence at trial regarding the larger conspiracy did not impair the jury's ability to evaluate the narrower conspiracy to which Sanchez was party. Moreover, we affirm the district court's sentence because the alleged drug calculation error had no effect on the sentence imposed.

Exercising jurisdiction under 28 U.S.C. § 1291, we AFFIRM the judgment and sentence of the district court.

# I. Background

Jose Manuel Marquez Sanchez met Oscar Bernal Lopez in late 2016 or early 2017 and the two men became close friends. Lopez ran a large-scale drug distribution operation, which the government had been surveilling since January 2016. Sanchez testified at trial that he began selling methamphetamine on the side when his wife became seriously ill and he needed the money to pay for her medical expenses. Sanchez also reported that he began using drugs around this time because he was depressed about his wife's health.

The government's eighteen-month-long investigation into Lopez's operation ended in July 2017 and resulted in a 125-count indictment charging ten people, including Sanchez, with various drug-related crimes. According to the government, the methamphetamine conspiracy operated as follows: Lopez would dispatch his associates, usually Blanca Flores or Armando Jimenez, to Phoenix, Arizona, to pick up methamphetamine and bring it back to Oklahoma. Then one of Lopez's couriers, usually Chavira Delgado or Jaime Fernandez, would deliver the methamphetamine to individuals who would distribute the drugs around Oklahoma City. The government alleges Sanchez was one of these distributors.

During their investigation, the government used various methods to acquire information about the conspiracy, including wiretaps and controlled buys. Through these wiretaps, the government recorded conversations indicating that

Sanchez bought methamphetamine from Lopez six times, on five days, over a thirty-day period.[1] The call transcripts reveal that Sanchez would contact Lopez once Sanchez had lined up a customer, and then Lopez would arrange for one of his couriers to deliver the drugs to Sanchez. Three couriers charged in the grand jury indictment—Chavira Delgado, Omar Delgado, and Fernandez—each delivered methamphetamine to Sanchez. Sanchez then resold those drugs to third parties at cost, that is, he did not markup the price of the drugs but instead charged his customers the same price set by Lopez. For three of the six purchases, Lopez "fronted" the drugs to Sanchez, meaning he provided the drugs on credit with the understanding that Sanchez would later turn over the resale proceeds.

Based on these wiretapped calls, Sanchez was later charged with ten drug-related counts. Of the ten individuals named in the indictment, only Sanchez and Davila-Quinones went to trial. The two men were tried together, and after a five-day trial, both were convicted on all charges. For Count 1, the verdict form required the jury to separately determine guilt as to the cocaine conspiracy and the

---

[1] This total includes a transaction that the government alleges took place on March 24, 2017. Sanchez was not indicted for this purchase, nor was evidence of that purchase introduced at trial. But the amount of methamphetamine allegedly purchased by Sanchez on March 24, 2017, was included in the total drug amount attributed to him for sentencing purposes. This drug calculation is at issue on appeal.

methamphetamine conspiracy. For each drug, the jury had to check a box for either "500 grams or more," "50 grams or more," "Less than 50 grams," or "None." The jury found that Sanchez had conspired to distribute 500 grams or more of methamphetamine but checked "None" as to the cocaine. R., Vol. I at 1903–04.

After trial, the probation officer preparing the presentence investigation report (PSR) was tasked with calculating the total amount of methamphetamine attributable to Sanchez for the purpose of determining his base offense level under the Sentencing Guidelines. The government did not criminally charge Sanchez for a purchase on March 24, 2017, nor did the jury make any factual findings about a purchase on that date. Nevertheless, the PSR attributed to Sanchez 481.95 grams of methamphetamine for a transaction on March 24, 2017.

Sanchez objected to the PSR on the ground that there was no evidence of any transaction occurring on March 24, 2017, involving Sanchez, but the sentencing court overruled his objection and adopted the PSR's recommended calculation in holding Sanchez accountable for a total of 2.66 kilograms of methamphetamine. From this total, the court determined that Sanchez's base offense level was 32. Level 32 applies to the possession of between 1.5 and 5 kilograms of methamphetamine. Had the court excluded the contested March 24, 2017, transaction, the total amount of methamphetamine attributable to Sanchez

would have been 2.18 kilograms, and his base offense level would still have been 32. The sentencing range, based on Sanchez's adjusted offense level and Category I criminal history, was 151 to 188 months. The court explained that several mitigating factors justified a downward variance and imposed a sentence of 132 months' imprisonment on Counts 1, 31, 41, 44, 59, and 90, and 48 months on Counts 30, 38, 42, and 57, all to run concurrently.

## II. Analysis

Sanchez raises two issues on appeal. First, he argues the evidence adduced at trial failed to prove that he was part of the single, overarching Lopez conspiracy alleged in Count One of the superseding indictment. He accepts the government's evidence proves a smaller conspiracy but insists his right to a fair trial was substantially prejudiced by the variance between the conspiracy charged and the proof at trial. Second, Sanchez alleges the district court clearly erred at sentencing by holding him responsible for an excess quantity of methamphetamine.

### A. Conspiracy

To prove a conspiracy, the government must show: "(1) that two or more persons agreed to violate the law, (2) that the defendant knew at least the essential objectives of the conspiracy, (3) that the defendant knowingly and voluntarily became a part of it, and (4) that the alleged coconspirators were

interdependent." *United States v. Caldwell*, 589 F.3d 1323, 1329 (10th Cir. 2009) (internal quotation marks omitted). When an indictment charges a single overarching conspiracy, but the government only proves several smaller conspiracies, a variance occurs. *United States v. Carnagie*, 533 F.3d 1231, 1237 (10th Cir. 2008).

Not all variances are fatal. *Id.* at 1240. Rather, a variance between the indictment and the proof at trial is reversible error only if it is prejudicial—that is, if it denies the accused his right to a fair trial. *United States v. McClatchey*, 217 F.3d 823, 841 (10th Cir. 2000). In the conspiracy context, "[p]rejudice exists if the defendant lacked sufficient notice of the need to defend against smaller conspiracies, or if the jury imputed to the defendant evidence of guilt offered against coconspirators who were involved in other conspiracies." *United States v. Anthony*, 942 F.3d 955, 970 (10th Cir. 2019).

The defendant bears the burden of showing a variance occurred and that it was fatal. *United States v. Sells*, 477 F.3d 1226, 1237 (10th Cir. 2007). Whether a variance is sufficiently prejudicial to warrant a new trial is a question of law we review de novo. *McClatchey*, 217 F.3d at 831.

Sanchez alleges there was a fatal variance between the single drug conspiracy charged in the indictment and the evidence produced at trial. In his view, the trial evidence proved not one but two conspiracies: the global Lopez

conspiracy he was not a part of and a narrower conspiracy comprising himself, Lopez, and Chavira Delgado.  Sanchez argues the government's evidence only implicated him in the narrower conspiracy, but that the overwhelming evidence introduced against his co-defendant, Davila-Quinones, impaired the jury's ability to evaluate Sanchez's individual actions, thereby prejudicing his right to a fair trial.  He explains that while the trial evidence shows he only purchased drugs from Lopez on four days over a seventeen-day period, the evidence against his co-defendant spoke to "a sprawling interstate conspiracy" that—over the eighteen months of government investigation—had possessed and distributed large amounts of cocaine, methamphetamine, and marijuana.  Aplt. Rep. Br. at 7.  Sanchez claims this caused a prejudicial guilt-spillover effect, such that the jury determined his guilt by relying on the evidence adduced against his alleged co-conspirators.[2]

But assuming a variance occurred, we conclude it was not fatal.  In determining whether a variance caused a prejudicial spillover effect, we consider: (1) whether the evidence of separate conspiracies impaired the jury's ability to

---

[2]  As noted above, a variance also prejudices a defendant if it deprives the defendant of sufficient notice of the charges against him.  *United States v. Hill*, 786 F.3d 1254, 1266 (10th Cir. 2015).  Sanchez does not make any argument as to notice, however, until his reply brief.  As a result, he has waived this argument.  *See United States v. Pickel*, 863 F.3d 1240, 1259 (10th Cir. 2017) ("But he makes this argument for the first time in his reply brief, and it is therefore waived.").

isolate evidence about an individual conspirator and his actions; (2) whether the variance caused confusion among the jury concerning the use of certain evidence; and (3) whether the evidence was strong enough to support the jury's conviction. *Carnagie*, 533 F.3d at 1241.

As to the first factor, the Supreme Court explained in *Kotteakos v. United States*, 328 U.S. 750, 772–74 (1946), that the greater the number of conspiracies proved and defendants indicted and tried, the higher the probability of prejudice. The Court emphasized there was no set number of defendants and conspiracies that, if present, trigger a prejudice finding; instead, a reviewing court must look to the individual facts of each case to determine whether a defendant has suffered substantial prejudice. *See id.* at 773–74. The *Kotteakos* Court found reversible error where thirty-two individuals were indicted, nineteen co-conspirators were tried together, and at least eight separate conspiracies were proved. *Id.* at 752–53.

Our circuit precedent is also instructive. In *Carnagie*, we concluded that a variance was not prejudicial where thirty-four persons were indicted (eight of whom were joined in the conspiracy count), three defendants were tried together, and "at most," three conspiracies were proved. 533 F.3d at 1242. More recently, we held the "ratio" of eight co-conspirators indicted, three defendants tried together, and five separate conspiracies proved did not create a risk of prejudice

sufficient to warrant reversal of the defendant's conspiracy conviction. *United States v. Hill*, 786 F.3d 1254, 1268 (10th Cir. 2015). Notably, it remains true that "[o]ur Circuit has still not found a case post-*Kotteakos* with a ratio high enough to rise to the level of prejudice." *Id.* at 1268.

Here, nine defendants were indicted in the conspiracy count, as compared to thirty-two in *Kotteakos* and eight in *Carnagie* and *Hill*. And in this case, only two defendants were tried together, as compared to nineteen in *Kotteakos* and three in *Carnagie* and *Hill*. Sanchez does not attempt to state how many conspiracies were proven at trial, although the government contends that, at most, only two were proved: one involving Sanchez and one involving his co-defendant, Davila-Quinones. But Sanchez and Davila-Quinones both only distributed methamphetamine, and yet there was evidence at trial regarding a conspiracy to distribute cocaine. Even assuming the proof at trial established three separate conspiracies (one involving Sanchez, one involving Davila-Quinones, and a third involving the distribution of cocaine), the numerosity here is still less prejudicial than in *Hill,* where three defendants were tried together and evidence of five separate conspiracies was introduced. Accordingly, this factor cuts against a finding of substantial prejudice.

The second *Carnagie* factor asks whether the variance caused the jury to misuse evidence. Here, we consider (1) whether the evidence was so complex

that it rendered the jury unable to compartmentalize Sanchez's individual actions, (2) whether the transactions allegedly part of the broader conspiracy were "of the . . . same character" as the narrower acts in which Sanchez participated, and (3) whether the jury actually demonstrated that it could compartmentalize the evidence associated with each defendant. *Carnagie*, 533 F.3d at 1242–43.

The first consideration does not weigh in Sanchez's favor, as the evidence presented in this case was rather simple. It consisted primarily of the alleged conspirators' own statements made on wiretapped calls and testimony by their alleged co-conspirators identifying who was speaking on each call. *See id.* at 1242 ("While the jury heard evidence of many fraudulent transactions, the evidence implicating the defendants in their respective conspiracies was relatively simple. It consisted of testimony concerning the defendants' involvement, as well as . . . documentation for each transaction."). And while witnesses testified to the meaning of code-words and slang used on intercepted calls, those witnesses were the defendants' alleged co-conspirators, not expert witnesses. *See Hill*, 786 F.3d at 1269 (holding the "evidence here was not sufficiently intricate that the jury could not segregate [the defendant's] individual actions" where "[t]he evidence consisted of, among other things, eyewitness accounts, physical evidence, and security camera footage, rather than—for example—complex testimony from a

host of expert witnesses"). Thus, the evidence here was not so intricate as to impair the jury's ability to compartmentalize evidence.

The second consideration, whether the transactions constituting the broader conspiracy were of the "same character" as Sanchez's transactions, is less clear. The government argues this factor weighs against Sanchez because he and Davila-Quinones played a similar role and were both involved in the distribution of methamphetamine. Yet the government does not reckon with evidence of other transactions, such as the trial evidence concerning the distribution of cocaine and marijuana, which is arguably of a different character than the narrower acts in which Sanchez participated. *Cf. Carnagie*, 533 F.3d at 1242 ("[A]ll the transactions not involving [the defendants at trial] were of the exact same character as the transactions in which [the defendants at trial] allegedly participated.").

Nonetheless, the third consideration weighs heavily against Sanchez. The jury demonstrated its ability to compartmentalize evidence when it found Sanchez guilty of conspiring to distribute methamphetamine but found him not guilty of conspiring to distribute cocaine. This also lessens the import of the cocaine evidence in our analysis of the "same character" consideration above, because the jury clearly did not misuse the cocaine evidence when it determined Sanchez's guilt.

-12-

On balance, we conclude the second *Carnagie* factor weighs in favor of the government.

This leaves the third *Carnagie* factor, which "considers whether the prosecution presented enough evidence to convict [Sanchez] of the separate, smaller conspiracy." *Hill*, 786 F.3d at 1269. First, we must "strip away all the evidence of a larger conspiracy" and "ask if, excluding this evidence, there was still enough evidence to convict" Sanchez of a narrower conspiracy. *Id.* Second, "we must consider whether the evidence of the conspiracy in which [Sanchez] was implicated was so much weaker than the evidence introduced regarding the larger conspiracy that a substantial, prejudicial spillover must have resulted." *Id.* at 1269–70.

When we strip away the evidence of the larger conspiracy, we conclude there was enough evidence from which a reasonable jury could find that Sanchez was part of a smaller conspiracy to distribute 500 grams or more of methamphetamine. In that narrower conspiracy, Lopez served as wholesaler, Sanchez as retailer, and Chavira Delgado, Omar Delgado, and Fernandez as couriers. Indeed, Sanchez concedes that he participated in a narrower conspiracy to distribute methamphetamine, though in his view, the conspiracy comprised only Lopez, Sanchez, and Chavira Delgado.

Furthermore, the evidence proving Sanchez's role in the smaller conspiracy was strong enough to minimize the danger of prejudicial spillover. The evidence tying Sanchez to the smaller conspiracy was direct, rather than circumstantial. *Cf. id.* at 1270 (concluding, with "caution," that the evidence minimized the danger of prejudicial spillover even where "much of the evidence implicating [the defendant in the smaller conspiracy] was circumstantial"). And the direct evidence against Sanchez—consisting primarily of intercepted calls—was strong. The transcripts of these phone calls and the related testimony unequivocally show that on multiple occasions, Sanchez ordered and coordinated the delivery of methamphetamine for redistribution. Sanchez admits that he participated in these calls and purchased methamphetamine from Lopez on five occasions. Thus, the third *Carnagie* factor weighs against a finding of substantial prejudice.

Sanchez's argument as to prejudice focuses primarily on the powerful evidence of guilt that the government mounted against his co-defendant, Davila-Quinones. But Sanchez fails to address many of the factors this court considers in determining whether a variance was prejudicial. And besides, as explained above, application of those factors shows that there was little risk of prejudicial spillover on these facts.

In sum, even if a variance occurred here, Sanchez has not met his burden of showing that he suffered substantial prejudice as a result.

### B. Sentencing

We turn next to Sanchez's claim that the district court erred in attributing one pound and one ounce of methamphetamine to him at sentencing. "In determining whether the district court correctly calculated the recommended Guidelines range, we review de novo the district court's legal conclusions pertaining to the Guidelines and review its factual findings, including its determination of the quantity of drugs for which the defendant is held accountable under the Guidelines[,] for clear error." *United States v. Todd*, 515 F.3d 1128, 1135 (10th Cir. 2008). The court may affirm a sentence resulting from an incorrect guidelines calculation only if the error was harmless. *Id.* at 1139.

We decline to reach the merits of Sanchez's claim because we conclude the drug calculation error, if any, was harmless. Critically, "this court rejects assertions of errors in drug quantity calculations as harmless if they do not affect the defendant's Guidelines range," and the additional one pound and one ounce of methamphetamine at issue here did not affect Sanchez's range or base offense level. *United States v. Battle*, 706 F.3d 1313, 1318 (10th Cir. 2013); *see also United States v. Jeppeson*, 333 F.3d 1180, 1182 n.2 (10th Cir. 2003) (finding harmless the district court's reliance on the improper guidelines manual because relying on the correct manual would not have resulted in a different guidelines range); *United States v. Valdez*, 723 F. App'x 624, 628 n.5 (10th Cir. 2018)

(refusing to consider potential drug quantity error where it was "purely [an] academic exercise because it [did] not change Defendant's base offense level").

Moreover, at sentencing, the district court acknowledged Sanchez's actions may have been impacted by the health difficulties of his wife, and noted his lack of criminal history, strong family relationships, and significant number of labor skills. Due to these mitigating factors, the court declined to follow the advisory guideline range of 151 to 188 months and instead sentenced Sanchez to a term of 132 months. Despite this downward variance, Sanchez claims that remand is required because the district court could conceivably impose an even greater downward variance given the mitigating factors it found during the first sentencing. But this court has rejected similar arguments as "pure speculation" where, as here, the "factors on which the variance was based remain the same regardless" of the error. *United States v. Serrato*, 742 F.3d 461, 469 (10th Cir. 2014).

Accordingly, we conclude any error arising from the court's determination of the drug quantities was harmless.

## III. Conclusion

For the reasons articulated above, we AFFIRM Sanchez's conviction and sentence.

-16-