**UNITED STATES COURT OF APPEALS**   **August 30, 2011**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

ROBERT LANDRY,

      Defendant-Appellant.

No. 10-8077
D.C. No. 2:09-CR-00355-ABJ-7
District of Wyoming

**ORDER AND JUDGMENT**[*]

Before **GORSUCH, HOLLOWAY**, and **MATHESON**, Circuit Judges.

Defendant-Appellant Robert Landry was a street-level methamphetamine dealer in

Western Wyoming. In a joint jury trial with co-defendant Cesar Acosta-Gallardo, Landry

was convicted on one count of conspiracy to possess with intent to distribute, and to

distribute, more than 50 grams of methamphetamine (actual).[1]

---

[*] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. This court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be cited under
the terms and conditions of 10th Cir. R. 36.3.

[1] 21 U.S.C. § 841(b)(viii) provides a minimum sentence for a 21 U.S.C. § 841(a)
violation involving "50 grams or more of methamphetamine, its salts, isomers, and salts
of its isomers or 500 grams or more of a mixture or substance containing a detectable
amount of methamphetamine, its salts, isomers, or salts of its isomers." The unit of
measurement, "methamphetamine (actual)," thus denotes methamphetamine, its salts,

(continued...)

Landry appeals his conviction, arguing that his being tried jointly with Acosta-Gallardo prejudiced his substantial rights because the government failed to show that they were a part of the single conspiracy charged in the indictment. Landry also appeals his sentence, arguing that the district court committed plain error by including the methamphetamine he acquired for personal use in the quantity calculation for his sentence. Lastly, Landry argues that the district court abused its discretion by failing to sever his trial from Acosta-Gallardo's trial. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm Landry's conviction and sentence.

## I. Facts

The evidence against Landry was introduced primarily through the testimony of his co-defendants. Additional related facts are detailed in our disposition of Acosta-Gallardo's appeal, No. 10-8075, United States v. Acosta-Gallardo.[2]

Testimony of Alvaro Alvarado-Sanabria

Alvaro Alvarado-Sanabria ("Alvarado") was Landry's primary supplier of methamphetamine from the summer of 2007 until approximately July of 2009. R., Vol. 3 at 346, 358.

---

(...continued)
isomers, and salts of its isomers, as distinguished from a mixture containing any of them.

[2] Our published opinion in *United States v. Acosta Gallardo*, --- F.3d ----, affirms Acosta-Gallardo's conviction. Acosta-Gallardo did not separately raise objections to his sentence.

Alvarado obtained methamphetamine from three sources: co-defendant Acosta-Gallardo, co-defendant Juvenal Garcia, and another man referred to as "Police." *Id.* at 153-54. In late 2006 or early 2007 when Alvarado began selling methamphetamine, co-defendant Brahnson Arnell ("Arnell") was his only customer. *Id.* at 148-50. Arnell, in turn, had his own methamphetamine customers. *Id.* at 333. Arnell later introduced Alvarado to some of his (Arnell's) customers. *Id.* at 333. Alvarado suspected that Arnell's customers were unhappy with Arnell for being lazy and for "cutting" or "shorting" the drugs,[3] and that Arnell sought to excise himself from their dealings. *Id.* at 333-34. These customers included Matt Owens, Spencer Martin, Charles Thunehorst, Charles Jerabek, Robert Houston, Sherri Obert, and Jason Freeman. *Id.* at 341. Importantly, Landry was also introduced to Alvarado by Arnell. *Id.* at 340-41.

Landry's first meeting with Alvarado occurred on Arnell's property in Wyoming. *Id.* at 345-46. Alvarado testified that the purpose of this meeting was to sell drugs. *Id.* at 346. Between 2007 and 2009, Alvarado sold half-ounce to one-ounce quantities of methamphetamine to Landry, except for on one occasion when Alvarado sold Landry four ounces of methamphetamine. *Id.* at 347. The sales varied in frequency from once a week to once every two weeks. *Id.* In total, Alvarado estimated that he sold two to four pounds of methamphetamine to Landry. *Id.* at 359.

---

[3] Alvarado defined "cutting" to mean "making [more] drugs with MSM." R., Vol. 3 at 334. In other words, Arnell would dilute the purity of the drugs by mixing them with other substances. "Shorting" meant that Arnell "was taking some quantity from the . . . drugs, some grams." *Id.* In other words, the quantity of drugs Arnell sold was less than what he represented it to be.

About a year after Alvarado began selling methamphetamine to Landry, he allowed Landry to obtain methamphetamine on credit. *Id.* at 348. He would provide methamphetamine to Landry and Landry would subsequently pay him for it, after he collected the money. *Id.* Sometimes, Landry was able to pay Alvarado back as agreed, but sometimes Landry would disappear for months without paying Alvarado back. *Id.* at 348-49. Accordingly, during the two years when Alvarado and Landry transacted in methamphetamine, there were two lapses of time, one of three months and one of six months, when Alvarado did not sell methamphetamine to Landry. *Id.* at 356.

From 2007 to 2008, Alvarado lived in Park City, Utah. *Id.* at 165. In 2009, Alvarado moved to Salt Lake City, Utah. *Id.* Alvarado testified that he would meet with Landry at predetermined locations in Utah and in Wyoming to exchange methamphetamine and money. *Id.* at 412-13. The locations were assigned code numbers and Alvarado would send a text message to Landry to communicate the meeting location. *Id.* at 413.

Testimony of Brahnson Arnell

Arnell testified that when he first began obtaining methamphetamine from Alvarado, his customers included Landry, Jason Freeman, Charles Thunehorst, and Charles Jerabek. R., Vol. 3, Tr.[4] at 683-84. After he introduced Alvarado to his

---

[4] A portion of Volume Three (in part 3 of 7) of the appellate record is inexplicably unpaginated. For this portion of the record, we reference the record as "R., Vol. 3 Tr." to denote page references corresponding with the pagination of the trial transcript rather than the pagination of the appellate record.

customers, Arnell testified that there were "frequent meetings down there at my property" where Landry, Alvarado, Matt Owens, and Jason Freeman would meet. *Id.* at 688-90.

After he introduced Landry to Alvarado, Arnell testified that he "left it up to Alvarado if he wanted to deal with [Landry] or not." *Id.* at 688. Arnell also testified as follows:

> [A]fter introducing [Landry and Alvarado], Alvarado would call me 'cause he couldn't get in touch with [Landry] a few times, and he'd call me up and say, hey, what's the deal with [Landry]. I'd say, ah, that was your deal, you know, I don't have anything to do it with [sic]. But since I introduced him, he kind of, kind of held me responsible.

*Id.* at 690. Arnell once took Alvarado to Landry's residence to show Alvarado where Landry lived. *Id.* at 692. Arnell testified that the trip's purpose was for Alvarado to address an outstanding debt that Landry owed him (Alvarado). *Id.*

Arnell testified that Landry once obtained one ounce of methamphetamine from Alvarado and put it on Arnell's "tab." Arnell then had to pay Alvarado for the amount owing. *Id.* at 684, 691. For a time, Arnell acquired drugs from Landry because Alvarado would not sell methamphetamine to Arnell. *Id.* at 694-95.

Arnell testified that he twice witnessed Matt Owens obtaining methamphetamine from Landry. *Id.* at 698-99. He once witnessed Jason Freeman obtaining methamphetamine from Landry. *Id.* at 695. He once observed Bob Simmons obtaining methamphetamine from Landry. *Id.* He observed Tom Burkett, George Burkett, Wade Sheer, and Wade Sheer's daughter each obtaining methamphetamine from Landry on two or three occasions. *Id.* at 695-99. Arnell testified that George and Tom Burkett usually

- 5 -

cleaned around Landry's property or fixed up vehicles in exchange for methamphetamine. *Id.* at 697. According to Arnell, "Tom Burkett was Bobby's muscle." *Id.* at 696. This meant that "if somebody owed [Landry] [money], he would have Tom go out and get them or go see if he can collect." *Id.*

Testimony of DEA Special Agent Brian Mix

Special Agent Brian Mix of the DEA testified that a conservative estimate of the quantity of methamphetamine involved in the investigation of the conspiracy charged was forty pounds. R., Vol. 3 at 534. Special Agent Mix testified that the total quantity of methamphetamine attributable to Acosta-Gallardo was over ten pounds. *Id.* at 534-35. Special Agent Mix testified that total quantity of methamphetamine attributable to Landry over the course of the conspiracy was two to four pounds. *Id.* at 535.

Evidence of Drug Purity

The evidence of drug purity in this trial was introduced from chemical analyses of drugs from one controlled purchase from Alvarado and from a seizure of drugs from Alvarado's apartment in Park City, Utah. R., Vol. 5, Ex. 175. The parties stipulated to the purity rates determined from chemical analysis of those samples which were as follows: 100.3 grams at 90.4% pure; 262.3 grams at 72.2% pure; 1,048 grams at 92.2% pure; 27.8 grams at 7.4% pure; 101.7 at 83.1% pure; and 201.9 grams at 91.5% pure. R., Vol. 3 Tr. at 835-38.

## II. Analysis

Count One of his indictment charged Landry and his thirteen co-defendants with conspiracy to possess with intent to distribute and to distribute 50 grams or more of methamphetamine (actual). To prove a single conspiracy, the government has to demonstrate (1) that two or more persons agreed to violate the law, (2) that the defendant knew at least the essential objects of the conspiracy, (3) that a defendant knowingly and voluntarily became a part of it, and (4) that the alleged coconspirators were interdependent. *United States v. Caldwell*, 589 F.3d 1323, 1329 (10th Cir. 2009) (citing *United States v. Sells*, 477 F.3d 1226, 1235 (10th Cir. 2007)).

Landry argues that he was not involved in any conspiracy with Alvarado's suppliers, Alvarado's other customers, or Arnell. Because a single conspiracy involving these individuals was charged, but evidence of multiple conspiracies was introduced at trial, Landry argues that a fatal variance occurred and that his conviction and sentence must therefore be reversed. We disagree. Assuming *arguendo* that a variance occurred, we find that Landry's substantial rights were not prejudiced and therefore affirm his conviction and sentence.

A variance requires reversal if the defendant's substantial rights were prejudiced. *United States v. Powell*, 982 F.2d 1422, 1431 (10th Cir. 1992) (citing *Kotteakos v. United States*, 328 U.S. 750, 764-65 (1946)). We review de novo the question of whether a variance was prejudicial. *United States v. Carnagie*, 533 F.3d 1231, 1240 (10th Cir. 2008) (citing *United States v. Williamson*, 53 F.3d 1500, 1512 (10th Cir. 1995)). "A defendant's substantial rights are affected if the jury determines a defendant's guilt by

relying on evidence adduced against coconspirators who were involved in separate conspiracies." *Powell*, 982 F.2d at 1431 (citing *Harrison*, 942 F.2d at 758). "A variance can also prejudice a defendant's substantial rights 'if the evidence adduced against co-conspirators was more likely than not imputed to the defendant by the jury in its determination of the defendant's guilt.'" *Carnagie*, 533 F.3d at 1241 (quoting *United States v. Windrix*, 405 F.3d 1146, 1154 (10th Cir. 2005)). A variance is also substantially prejudicial if the defendant's sentence is increased on the basis of the drug-related activities of defendants with whom the defendant did not conspire. *Caldwell*, 589 F.3d at 1333.

In this case, Landry argues that the variance was prejudicial and that his substantial rights were prejudiced because the jury imputed evidence of separate conspiracies to Landry and because Landry's sentence was increased based on unrelated drug activity.

i. Landry's Guilt or Innocence

On the issue of Landry's guilt, to determine whether there was a "prejudicial spillover effect" from evidence pertaining to conspiracies not involving Landry, we focus on three questions:

> "*First,* whether the proliferation of separate crimes or conspiracies presented in the case impaired the jury's ability to segregate each individual [conspirator's] actions and the evidence associated with [her or] his participation; *Second,* whether confusion among members of the jury concerning the legal limitations on the use of certain evidence resulted from the variance; and, *Third,* the strength or weakness of the evidence underlying the jury's conviction."

*Carnagie*, 533 F.3d at 1241 (quoting *Harrison*, 942 F.2d at 758).  We address each in turn.

On the first question, in determining whether the proliferation of separate conspiracies impaired the jury's ability to segregate the evidence against the conspirators, our court has observed that "[n]umbers are vitally important in trial, especially in criminal matters."  *Carnagie*, 533 F.3d at 1242 (quoting *Kotteakos*, 328 U.S. at 772).  In *Carnagie*, thirty-four individuals were indicted, but only three defendants were tried together, and "at most, three conspiracies were proven."  *Id.*  Accordingly, our court observed that the risk of prejudice was not as great as in *Kotteakos*, where 32 people were indicted, 19 defendants were tried together, 13 names were submitted to the jury, and at least 8 separate conspiracies were proven.  *Id*. (discussing Kotteakos, 328 U.S. at 753); *see also Berger v. United States*, 295 U.S. 78, 80 (1935) (substantial rights were not prejudiced where four defendants were tried for a single conspiracy and two separate conspiracies were proven).  Here, although fourteen defendants were indicted with Landry, this trial involved only two defendants, Landry and Acosta-Gallardo.  Based on this headcount, the risk of prejudice was not as great as in *Kotteakos*, and also less than that at issue in *Carnagie*, where we found the defendant's rights were not substantially prejudiced.  The scope was more akin to that in *Berger v. United States*, where the Supreme Court held that a defendant's substantial rights were not prejudiced in a joint trial with three other

defendants who were tried for a single conspiracy, when only two conspiracies were proven.  295 U.S. 78, 80 (1935).

Landry does not identify specific instances of prejudicial spillover, but argues that there was almost certain confusion between the jurors because the government "encouraged the jury to impute the evidence related to the separate conspiracies to Landry."  Aplt's Br. 27 (citing R., Vol. 3 at 873-74).  We find that this mischaracterizes the portion of the government's closing argument cited, where it explained its theory of a single conspiracy.  In the same breath, the government also reiterated its burden of proof, saying that "the Government has to prove to you beyond a reasonable doubt that this conspiracy itself and people involved, Mr. Acosta and Mr. Landry, were responsible for 50 grams or more of methamphetamine."  R., Vol. 3 at 873.  We do not think this constitutes "encouragement" of the type or scope that would impair the jury's ability to segregate Landry's actions from those of others.

Moreover, the evidence introduced was relatively simple.  Acosta-Gallardo dealt in large quantities of methamphetamine, whereas Landry dealt in smaller quantities.  Landry and Acosta-Gallardo did not know each other and did not transact with one another.  *See Carnagie*, 533 F.3d at 1242 ("All three defendants worked for different lenders on unrelated transactions . . . and they did not even know each other.  Under these circumstances, the jury could easily have separated the evidence associated with [the

defendants]."). Thus, we find that the jury could have separated the evidence associated with each of them.

As to the second consideration, Landry argues that "it is virtually certain that there was confusion among members of the jury" because "[t]he government told the jury that they should consider all evidence presented regarding all of the indicted individuals in making its determination with respect to Landry." *Id.* at 28. As stated above, we find that this mischaracterizes the government's statement at argument.

Landry next argues that jury confusion resulted from the district court's failing to provide an instruction regarding the possibility of finding multiple conspiracies. Our circuit has held that "a failure to instruct the jury on uncharged multiple conspiracies is not reversible error as long as the jury instructions adequately conveyed that 'the government had the burden of proving beyond a reasonable doubt the [single] conspiracy as alleged, and that the evidence should be considered separately as to each individual defendant.'" *Evans*, 970 F.2d at 675 (quoting *Watson,* 594 F.2d at 1340). Here, we find that the district court's instructions adequately conveyed the government's burden of proof.

The district court instructed the jurors that guilt must be determined as to each defendant. The instruction was as follows:

> A separate crime is charged against one or more of the defendants in each count of the indictment. You must separately consider the evidence against each defendant on each count and return a separate verdict for each defendant.

Your verdict as to any one defendant or count, whether it is guilty or not guilty, should not influence your verdict as to the other defendant or counts.

R., Vol. 1 at 133 (Instruction 14). Next, the district court explained the government bore the burden of proving the defendants guilty beyond a reasonable doubt of the crimes charged." *Id.* at 134 (Instruction 15). After explaining the essential elements of a conspiracy offense, the district court also cautioned that "Mere similarity of conduct among various persons, and the fact they may have associated with each other, and may have assembled together and discussed common aims and interests, does not necessarily establish proof of the existence of a conspiracy." *Id.* at 139 (Instruction 19).

We find that these instructions adequately conveyed the government's burden to prove guilt beyond a reasonable doubt as to each defendant on the conspiracy offense. Moreover, "[w]e generally assume that jurors follow the judge's instructions." *Carnagie*, 533 F.3d at 1243 (citing *United States v. Chanthadara*, 230 F.3d 1237, 1251 (10th Cir. 2000)). Consequently, we find that the district court's instructions would have cured any confusion on the part of jurors. *See also Evans*, 970 F.2d at 675 (finding that the district court's giving similar instructions was adequate to avoid any reversible error for failing to give a multiple conspiracy instruction).

On the last factor, the strength or weakness of the evidence underlying the jury's conviction, we find that sufficient evidence of Landry's guilt was introduced at trial. *See United States v. Ailsworth*, 138 F.3d 843, 850 (10th Cir. 1998) ("Whether Defendant's substantial rights were prejudiced also depends on whether the evidence was sufficient for

the jury to convict Defendant of a separate conspiracy."). The evidence overwhelmingly established that Landry was engaged in a conspiracy to distribute methamphetamine for profit with Alvarado, which Landry appears to recognize as well. Aplt's Br. 26 ("[A]lthough the government introduced evidence that Landry was involved in perhaps one conspiracy with Alvarado . . .").

The evidence at trial demonstrated that Landry and Alvarado were engaged in a conspiracy to distribute methamphetamine for profit. To facilitate Landry's distribution of methamphetamine, Alvarado allowed Landry to purchase methamphetamine on credit, whereby Alvarado would "front" Landry methamphetamine, then accept payment for it after Landry sold it and collected money from the sales. "'Our court has previously held that providing drugs on credit can be sufficient to demonstrate a conspiracy to distribute drugs.'" *Caldwell*, 589 F.3d at 1330 (quoting *United States v. Hamilton*, 587 F.3d 1199, 1210-11 (10th Cir. 2009)); *see United States v. Roberts*, 14 F.3d 502, 511 (10th Cir. 1993) ("Fronting creates a situation of mutual dependence because the seller's ability to front drugs is dependent on his receipt of money due.").

Without Alvarado's supply of methamphetamine, Landry would have been unable to distribute methamphetamine. *See Carnagie*, 533 F.3d at 1239 n.5 ("[I]nterdependence in a drug conspiracy may stem from the illegal nature of the drug trade itself," because "[e]ach participant [in a drug distribution business] is presumptively aware of the illegal nature of the activity and of the existence of the illegal venture."). Each step in the supply chain, from Alvarado to Landry, and from Landry to his customers, formed an

- 13 -

essential and integral step towards the realization of the goal of profiting from the illegal distribution of methamphetamine. *See United States v. Dickey*, 736 F.2d 571, 581-82 (10th Cir. 1984); *United States v. McIntyre*, 836 F.2d 467, 471 (10th Cir. 1988) ("In order for the Government to establish a case of conspiracy against the defendant, it must sufficiently prove that the defendant had a common purpose with his coconspirators to possess and distribute cocaine.").

Accordingly, we find that the evidence of Landry's guilt to be well-supported by the evidence.

ii. Landry's sentence

Landry also argues that the variance was substantially prejudicial because his sentence was enhanced based on the unrelated drug activities of others. We review a sentencing court's determination of drug quantity for clear error. *Caldwell*, 589 F.3d at 1333 (citing *United States v. Zapata*, 546 F.3d 1179, 1192 (10th Cir. 2008)).

Landry argues that the district court committed clear error because it failed to make express findings on the record and it did not expressly adopt the presentence investigation report's ("PSR") findings on drug quantity. However, the transcript from the sentencing hearing suggests otherwise. The district court reviewed Landry's PSR and its finding that the base offense level involved possession of between 50 and 150 grams of methamphetamine (actual). R., Vol. 3, Part 7 at 7. The district court then also reviewed the testimony of Arnell and Alvarado, in particular, Alvarado's estimate that he sold between two and four pounds of methamphetamine to Landry. R., Vol. 3, Part 7 at

- 14 -

7. Moreover, because the district court found Alvarado's testimony credible, we do not review it here. *See United States v. Ivy*, 83 F.3d 1266, 1289 (10th Cir. 1996) ("The credibility of a witness whose testimony is relied upon at sentencing is for the sentencing court to analyze.") (internal quotation omitted). Thus, we do not find error in the district court's adoption of the PSR's drug quantity finding.

The jury's special verdict also made a drug quantity finding of 50 grams or more of methamphetamine (actual). The district court instructed the jury regarding findings on drug quantity as follows:

> [T]here are two ways the government can prove the amount of the methamphetamine a defendant is accountable for in the conspiracy as charged in count one of this indictment. First, by proving the amount of methamphetamine intended to be possessed with intent to distribute and/ or distributed personally by a defendant during the conspiracy. The second is based on the legal rule that all members of a conspiracy are responsible for acts committed by other members, as long as those acts were committed to help advance the objective of the conspiracy, and are reasonably foreseeable to that defendant."

R., Vol. 3 at 155-56 (Instruction 32). Using the more conservative calculation as to what the defendant possessed with intent to distribute or distributed during the course of the conspiracy, the evidence presented by the government was sufficient to find that Landry possessed with intent to distribute more than 50 grams of methamphetamine (actual).

Alvarado estimated selling two to four pounds of methamphetamine to Landry from 2007 to 2009. Special Agent Mix's testimony also reflected this estimate. At the conservative end of Alvarado's estimate, two pounds of methamphetamine equals 908 grams of methamphetamine (1 pound = 494 grams). At the lowest purity of 7.4%, the

- 15 -

two pounds of methamphetamine equals 67.2 grams of methamphetamine (actual), which exceeds the 50 grams of methamphetamine (actual) charged in the indictment.

Landry strains to argue that the evidence adduced by the government does not demonstrate that 50 grams of methamphetamine (actual) were attributable to Landry by engaging in arithmetic acrobatics. Landry proposes a deflated conversion whereby two pounds[5] converts to 806.4 grams of methamphetamine.[6] However, even using this figure, at the lowest purity stipulated to by the parties (7.4% purity), Landry's figure yields roughly 59.7 grams of methamphetamine (actual). This figure does not include the quantities Landry obtained from those other than Alvarado, such as Arnell, for which Landry was held responsible. *See United States v. Robertson*, 45 F.3d 1423, 1445 (10th Cir. 1995) (A defendant may be held responsible for "the total amount of drugs involved as if the object of the conspiracy had been completed, provided that the drug quantities were reasonably foreseeable to the defendant and within the scope of his conspiratorial agreement."). Thus, we do not find clear error in the PSR's drug calculation or that the jury's drug quantity finding resulted from erroneously attributing unrelated activity to Landry.

---

[5] Landry argues, for the first time in his reply brief, that Alvarado's testimony conflicts with itself. We do not consider this argument because it was raised for the first time in his reply brief.

[6] Landry converts two pounds into 32 ounces (1 pound = 16 ounces), then uses a conservative multiplier to convert from ounces to grams (1 ounce = 28.3 grams; Landry rounds down to 28 grams per ounce), to derive 896 grams. Because Alvarado testified that he was 90% certain that he sold Landry two to four pounds of methamphetamine, Landry multiplies 896 grams by 90% to yield 806.4 grams.

Landry argues that our decision in *Caldwell* dictates that we remand his sentence because the quantity determination was clearly erroneous. In *Caldwell*, our court remanded a defendant's sentence after finding that the drug quantity calculations were based on an unsupported tripartite conspiracy. 589 F.3d at 1333. The pre-sentence report in *Caldwell* based its quantity finding on unrelated drug activity. Moreover, our court found that the jury's quantity finding, while plausible, was not demonstrated beyond a reasonable doubt. *Id.* Because the *Caldwell* district court based its drug quantity finding on both the PSR calculation and the jury's finding, our court held that it was clearly erroneous and remanded for resentencing. *Id.* at 1333-34. Because we do not find error with the sentencing court's drug quantity finding, nor do we find that the jury attributed unrelated drug activity to Landry, we do not find that *Caldwell* dictates remanding Landry's sentence.

We therefore do not find that Landry was substantially prejudiced by any variance that may have occurred.

B. Whether the District Court Committed Plain Error in Calculating the Quantity Attributable to Landry

Landry argues that the district court erred by including quantities of methamphetamine obtained by Landry for personal use in its drug quantity calculation. Because this argument was not raised below, we review only for plain error. To satisfy plain error review, Landry must demonstrate that there was "(1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity,

or public reputation of judicial proceedings." *United States v. Gonzalez-Huerta*, 403 F.3d 727, 732 (10th Cir. 2005) (en banc).

When determining Landry's statutory sentencing range,[7] the district court may only consider quantities of drugs involved in the offense of conviction. *United States v. Asch*, 207 F.3d 1238, 1243 (10th Cir. 2000) ("Under a plain reading of [21 U.S.C.] § 841(b), 'the statutory directives are exclusively a function of the quantities involved in the offense of conviction.'") (quoting *United States v. Santos*, 195 F.3d 549, 551 (10th Cir. 1999)). In *Asch*, our court explained that "[d]rugs handled by [the defendant] in transactions, or components of a transaction, that lacked the common objective of distribution were not involved in the offense[] of conviction and cannot be included when determining the applicable sentencing range under 21 U.S.C. § 841(b)." *Id.* at 1245 (citing *Santos*, 195 F.3d at 552).

"The government must prove the quantity of drugs involved in the offense of conviction 'by a preponderance of the evidence at sentencing in order to trigger the mandatory minimum sentences prescribed in 21 U.S.C. § 841(b).'" *Id.* at 1246 (quoting *United States v. Silvers*, 84 F.3d 1317, 1320 (10th Cir. 1996)). However, the district court "is permitted to infer that the entire quantity of drugs the defendant obtained from her co-

---

[7] Based on Landry's offense of conviction and his criminal history background, his Sentencing Guidelines Range was between 121 and 151 months of imprisonment. The sentencing court granted a downward variance of one month, and Landry was sentenced to a term of imprisonment of 120 months—the statutory minimum for conspiring to distribute 50 grams or more of methamphetamine (actual). 21 U.S.C. § 841(b)(viii).

- 18 -

conspirator during the course of the conspiracy to distribute, as proven by the government by a preponderance of the evidence, was obtained with the common objective of distribution." *Id.* (citing *Wingfield v. Massie*, 122 F.3d 1329, 1333 (10th Cir. 1997)). To put at issue the absence of a common distribution objective, *Asch* held that "a defendant must produce evidence tending to demonstrate that []he always intended to personally consume some specific portion of the drugs received from h[is] co-conspirator." *Id.* (citing *United States v. Wyss*, 147 F.3d 631, 633 (7th Cir. 1998)).

In this case, Landry did not produce evidence tending to demonstrate that he always intended to personally consume some specific portion of the drugs received from his co-conspirators. Landry did not introduce testimony tending to demonstrate what specific quantity of methamphetamine Landry consumed. Landry did marshal the testimony of co-conspirators demonstrating quantities he did distribute, then argued that the difference between what he obtained from Alvarado and what he was shown to have sold should be considered the quantity he personally consumed. This, however, is insufficient to put his personal use at issue under the *Asch* standard.

On this record, we cannot find that the district court committed plain error when it failed to consider Landry's personal use quantities.

C.    <u>Whether the District Court Abused its Discretion by Denying a Severance</u>

Landry argues that the district court abused its discretion when it denied Landry's motion to sever his trial from Acosta-Gallardo's. "To establish abuse of discretion, [a] defendant must show that 'actual prejudice resulted from the denial.'" *Powell*, 982 F.2d

at 1432. A severance should be granted by the district court "'only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.'" *United States v. Youngpeter*, 986 F.2d 349, 353 (10th Cir. 1993) (quoting *Zafiro v. United States,* 506 U.S. 534, 539 (1993)). "There is a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro*, 506 U.S. at 537. "They promote efficiency and 'serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'" *Id.* (quoting *Richardson v. Marsh,* 481 U.S. 200, 210 (1987)).

Landry argues that he suffered prejudice because substantial evidence regarding multiple conspiracies was admitted at trial, the government encouraged the jury to consider the evidence in considering Landry's guilt, and the jury instructions reinforced the government's argument. Aplt's Br. at 43. Consequently, Landry argues that the jury was unable to sift through the evidence and 'make an individualized determination as to each defendant.

As explained above, a reasonable jury could find that 50 grams or more of methamphetamine (actual) were attributable to Landry based only on the evidence from Alvarado. Assuming *arguendo* that this was the only conspiracy in which Landry participated, the evidence was sufficient to support the jury's verdict and Landry has not made a showing of real prejudice. Thus, we find that Landry has not demonstrated that he suffered actual prejudice in his joint trial with Acosta-Gallardo and therefore the district court did not abuse its discretion by denying Landry's motion for severance.

### III. Conclusion

For the foregoing reasons, we affirm.

Entered for the Court

William J. Holloway, Jr.
Circuit Judge