**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 10, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

VERNON JAMES HILL,

    Defendant - Appellant.

No. 12-5176

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**
**(D.C. No. 4:11-CR-00179-GKF-1)**

---

Neil D. Van Dalsem (Robert Scott Williams, with him on the briefs), Taylor, Ryan, Schmidt & Van Dalsem, P.C., Tulsa, Oklahoma, for Defendant – Appellant.

Leena Alam, Assistant United States Attorney (Danny C.Williams, Sr., United States Attorney, with her on the brief), Northern District of Oklahoma, Tulsa, Oklahoma, for Plaintiff – Appellee.

---

Before **HARTZ, HOLMES,** and **BACHARACH,** Circuit Judges.

---

**HARTZ,** Circuit Judge.

---

Defendant Vernon Hill appeals the denial of his motion for a new trial after his conviction for bank robbery. The motion arose out of a change in the government's theory about the involvement of Defendant's two brothers, Stanley and DeJuan, in the robbery. In the trial at which Defendant was convicted, the government prosecuted him and Stanley as the two masked men who robbed an Arvest Bank in Tulsa, Oklahoma, on November 5, 2011. The jury convicted Defendant but could not agree on Stanley, although Stanley was later retried and convicted. Several months after Defendant's conviction, the government, having obtained cell-phone data and other additional evidence, charged Defendant and DeJuan with conspiring to commit various robberies, including the robbery of the bank. In presenting the new case to the grand jury, FBI agent Charles Jones testified that the government's understanding of the bank robbery had changed: Stanley had not been one of the robbers in the bank but had driven the getaway car; the two robbers were Defendant and DeJuan.

Having obtained Jones's grand-jury testimony during discovery in defense of the new conspiracy charge, Defendant moved to set aside his prior conviction and get a new trial on the bank-robbery charge. For reasons that will be further explained below, the prosecutor at the first trial had emphasized that there were precisely two men involved in the robbery. Agent Jones's later admission in grand-jury testimony that this theory was wrong constituted, in Defendant's view, new, exculpatory evidence that entitled him to a new trial.

2

We disagree and affirm the denial of Defendant's motion for a new trial. Agent Jones's admission that the government's earlier two-robbers theory was wrong was not admissible evidence. And nothing else described by Defendant as newly discovered evidence (he explicitly declines to rely on the new cell-phone data) was newly discovered because he knew of the evidence during his trial.

## I.  BACKGROUND

### A.  The Trial

Defendant was tried before a jury in the Northern District of Oklahoma. Prosecution witnesses described the events as follows:  The robbery began when two men wearing black ski masks entered the bank and shouted for everyone to get on the ground. One of the robbers carried a gun while the other hopped the counter and told bank employees to open their cash drawers and a cash dispenser and put the contents in his bag. When the employees filled the bag, they included bait bills whose serial numbers had been recorded and a GPS tracking device. After collecting the cash the robbers fled the bank on foot. The bank's surveillance video did not capture the robbers' faces, but did show that they wore black pants, one wore dark shoes and a black hooded jacket with some white on the inside, and the other wore a black long-sleeved shirt covered by a light-colored T-shirt.

Police officers followed the GPS tracking device to a house on East Pine Street and established a perimeter around it. They arrived at the house within 10 to 15 minutes of the robbery. Several officers watched the house and saw no one enter or leave the

3

building. An officer stopped one vehicle that may have been leaving the area, but found only three people who appeared to be on their way to dry laundry.

Eventually, Stanley left the house through a back door and was arrested by officers, to whom he gave a false name. Defendant left through the same door about 20 or 30 minutes later and was also arrested. The police then searched the house and did not find anyone else. They discovered the bait bills, the GPS tracking device, and more than $86,000 in a pillowcase in a drawer under the oven. In the laundry room they found a light-colored T-shirt and a black shirt, which looked like the clothes worn by one of the robbers in the surveillance video. In one of the bedrooms they found a gun, a black ski mask, and a pair of black pants. In a second bedroom they found a black hooded jacket with some white on the inside, a pair of red and black shoes, and a piece of mail on the dresser addressed to Defendant.

After the prosecution rested, the defense put on evidence that no fingerprints of either brother were found at the bank and called as a witness Donnie Johnson, one of the officers who had been watching the house. Johnson was called because of his written report that he had seen a black Nissan leave the house's driveway shortly after he arrived on the scene. The report described the driver of the car as a black male with dreadlocks who was wearing a white T-shirt. On direct examination Johnson confirmed that he had seen a black Nissan parked in the house's driveway when he arrived on the scene; that it had left the house within a few minutes of his arrival; and that he had made eye contact with the driver as the car left but did not stop or question him. During the government's

4

cross-examination, Johnson acknowledged that he had not seen anyone enter or exit the house, and that a police perimeter had been established before his arrival. He then testified that when he entered the courthouse for trial he had noticed the driver of the Nissan, and he pointed him out in the courtroom. Neither party named the driver at the time, but there is no dispute that the man pointed out was DeJuan Hill.

The prosecutor argued in closing that because the police quickly followed the tracking device to the house and established a perimeter, no one could have come or gone unobserved. She told the jury, "I submit to you the testimony has been unrefuted that no one came or went to [the house] other than these two defendants . . . . No one else. The testimony was unrefuted." R., Vol. II pt. 3 at 557. She downplayed the importance of the car that Johnson had seen leaving the house:

> [Y]ou might listen for argument regarding this mysterious car that was seen in the area of [the house] . . . Officer Johnson testified that, one, he wasn't the first person on the scene. So think about the point in time when he arrived. Certainly a perimeter had already been established. You heard testimony from officers who said that they had it on-point, they were watching that back door. Didn't see anyone come or go until those two came out.

*Id.* at 535–36. She asked the jury to conclude that the two men who exited the house—Defendant and his brother Stanley—must have been the same two men who robbed the bank. She also reminded the jury about trial exhibits found in the house that were consistent with items worn by the robbers.

Defense counsel tried to cast doubt on the government's theory that the two men in the house must have been the bank robbers. He questioned whether the government

5

really established a secure perimeter, referencing Johnson's testimony about the car seen in the driveway: "[T]here are some significant cracks in the foundation of the government's case. One being the fact that there is a black male leaving in a car that does not get questioned." *Id.* at 550. He argued that the driver of that car "maybe had access to this house[,] came[,] and put that money there." *Id.* at 552. He also pointed out that none of the eyewitnesses to the robbery identified Defendant and that the government had no fingerprint evidence linking him to the bank.

The jury convicted Defendant, but did not reach a verdict as to Stanley.

## B. The Conspiracy Charge

A few months after his conviction, Defendant was charged with conspiracy to commit several robberies as a member of a street gang. One alleged overt act was the robbery of the Arvest Bank by Defendant and his brothers Stanley and DeJuan. FBI agent Charles Jones, who had also testified at Defendant's trial, laid out the government's new theory in grand-jury testimony. He based his analysis primarily on cell-phone data for phones linked to the three brothers, which showed what numbers were called and the approximate location of the phones. He also had learned that Stanley's girlfriend owned a black Nissan resembling the vehicle seen by Officer Johnson outside the house shortly after the robbery. Knowing the locations of the phones and what numbers were called, he inferred that Defendant and DeJuan traveled to the bank the night before the robbery to scope it out, and that the next day they met Stanley at his girlfriend's house before driving to the bank. Then, according to Jones, Defendant and DeJuan went inside to

6

commit the robbery while Stanley waited outside as the getaway driver. Finally, he concluded that DeJuan was the one seen driving the black Nissan away from the house. Defendant's role in the robbery did not change under this new theory, but now the government claimed that Stanley was the getaway driver and DeJuan was the other robber with Defendant in the bank. Jones summed up the change: "Initially, we believed that Stanley and [Defendant] were the robbers. . . . We were wrong. We think that Stanley was the getaway driver and that [Defendant] and DeJuan were the robbers." *Id.*, Vol. 1 at 163.

Jones's grand-jury testimony also briefly described monitored calls between Defendant and DeJuan when Defendant was in jail. DeJuan made statements suggesting that he was one of the robbers, such as "I'm playing boy on the run." *Id.*

### C. Defendant's Motion for New Trial

After receiving Jones's grand-jury testimony in the new criminal proceedings, Defendant filed a motion in the first case, arguing that he was entitled to a new trial based on newly discovered evidence. Although the motion does not explicitly identify anything as the "new evidence," its argument section uses the term *evidence* on three occasions that may indicate what is being referred to. Twice, the "evidence" appears to be the belief of the officers about who the robbers were: (1) "[Defendant] had no evidence that the officers who testified believed that DeJuan Hill was one of the robbers until [the last two weeks]," *id.* at 133; and (2) "[t]he evidence that the government's own witness, Mr. Jones, does not believe the government's theory of the evidence did not even exist

7

until after the trial," *id.* On the third occasion it appears to be evidence that someone had left the house before officers created a perimeter: "The new evidence from Mr. Jones is that, in fact, one of the two people who robbed the bank left the House before the House was secured by law enforcement officers," *id.* at 134. The motion also may be suggesting a different item of evidence when it argues that the government's two-robbers theory "completely unravels when the government concedes that a car, containing [a] previously unknown robber, left the house before the police arrived," *id.*; but there is no evidence of any car leaving the house before officers arrived.

## II.     DISCUSSION

A motion for a new trial may be granted "if the interest of justice so requires," Fed. R. Crim. P. 33, but a motion based on newly discovered evidence "is not favorably regarded and should be granted only with great caution." *United States v. Orr*, 692 F.3d 1079, 1099 (10th Cir. 2012) (internal quotation marks omitted). The district court's denial of a motion for a new trial is reviewed for abuse of discretion. *See id.*

To prevail on a motion for a new trial based on newly discovered evidence, the defendant must establish:

> (1) the evidence was discovered after trial; (2) the failure to learn of the evidence was not caused by lack of diligence; (3) the new evidence is not merely impeaching or cumulative; (4) the new evidence is material to the principal issues involved; and (5) the new evidence would probably produce an acquittal if a new trial were granted.

*Id.* Implicit in a claim of newly discovered evidence is that there is new *evidence*—that is, material that is admissible at trial. *See, e.g.*, *United States v. Parker*, 903 F.2d 91,

8

102–03 (2d Cir. 1990) (requiring that new evidence would probably produce an acquittal "presupposes, of course, that the proffered new 'evidence' would be admissible at the new trial."); *United States v. MacDonald*, 779 F.2d 962, 964 (4th Cir. 1985) ("To obtain a new trial on the basis of after discovered evidence, that evidence must be admissible in a new trial"); *United States v. Kamel*, 965 F.2d 484, 491 (7th Cir. 1992) (agreeing with *Parker*); *United States v. Dogskin*, 265 F.3d 682, 686 (8th Cir. 2001) (new testimony did not warrant a new trial because it was inadmissible); *Wolcher v. United States*, 233 F.2d 748, 749 (9th Cir. 1956) ("One important reason such alleged newly discovered evidence is insufficient . . . is that such evidence would be inadmissible . . . ."); *cf. United States v. Tolliver,* 730 F.3d 1216, 1228 (10th Cir. 2013) (inadmissible hearsay could not require new trial because it "at most constitutes impeachment evidence"); *United States v. Redcorn*, 528 F.3d 727, 744–45 (10th Cir. 2008) (proposed newly discovered evidence was either "inadmissible and incorrect" or unhelpful to the defendant's argument).

What then is the new *admissible* evidence relied on by Defendant? His briefs are unclear on this point, so we must proceed by a process of elimination.

One thing that is certain is that the new evidence is not the cell-phone data or Agent Jones's analysis of that data. On the contrary, Defendant emphatically argues that we cannot consider that data or analysis in our consideration of his claim.[1] The reason

---

[1] Defendant asserts in his opening brief that the government's suggestion that the only new evidence is cell-phone data is nothing more than a strategy "to create a straw man argument by identifying some other newly discovered evidence that it says would not

Continued . . .

for Defendant's position on the data is understandable. The analysis of the data is quite damning.

Perhaps Defendant is claiming that the new evidence is that DeJuan was the driver of the black Nissan observed by Officer Johnson. But Defendant knew that during trial—when Johnson pointed to DeJuan in the courtroom as the driver. Therefore, that evidence was not newly discovered.

Or perhaps the new evidence claimed by Defendant is that one of the robbers (specifically, DeJuan) had left the house after the money had been deposited there. But there was no new evidence placing DeJuan *in* the house after the robbery. No new witness observed him leave the house. And even the cell-phone evidence, which Defendant would not have us use, did not place him *in* the house—the data were not that precise and DeJuan's phone was apparently turned off at that time.

There remains only the possibility that the "new evidence" was that Agent Jones had a new theory of the case—in particular, that the prior two-robbers theory was incorrect. Defendant refers to this claim as "[t]he evidence that the government's own witness, Mr. Jones, does not believe the government's theory of the evidence." R., Vol. I

justify granting a new trial." Aplt. Br. at 16–17. The brief goes on to say that "undersigned counsel has not been able to find any published or unpublished decision where a court ruled that it would be proper, standing alone, to *deny* a defendant's new trial motion based upon the government's bald claim that it has other newly discovered evidence that would produce a conviction." *Id.* at 17. The reply brief, referring to the cell-phone evidence, says that the court "should not consider evidence that might be presented at retrial but which has not been presented in this case." Reply Br. at 11.

at 133. He also quotes Jones's statement that "We were wrong," *id.* at 201 (internal quotation marks omitted). Defendant argues that this new evidence would likely lead to his acquittal because the possibility of a third robber undermined the inference that the two men who left the house after the police arrived must have been the two robbers in the bank.

Before analyzing this remaining claim, we think it helpful to note an argument Defendant is not making. He is not claiming that he was denied due process by the change in the government's theory of its case. Such a due-process claim was considered, although not resolved, by the Supreme Court in a federal habeas action. In *Bradshaw v. Stumpf*, 545 U.S. 175 (2005), the defendant had pleaded guilty in state court, admitting to participation in a robbery in which he shot a man (who survived) but claiming that he did not shoot the woman who died. *See id.* at 178. The prosecutor argued at a penalty hearing before a three-judge panel that the defendant had shot the woman, and the panel sentenced the defendant to death. *See id.* at 179–80. In the later trial of the defendant's accomplice, however, the prosecutor argued, based on new testimony from the accomplice's cellmate, that it was the accomplice who had killed the woman. *See id.* at 180. The defendant moved to withdraw his plea or vacate his death sentence, arguing that the prosecutor's changed theory exonerated him as the shooter. *See id.* at 180–81. The motion was denied. *See id.* at 181. The Court held that the prosecutor's use of inconsistent theories did not invalidate the defendant's original guilty plea, but it did not decide whether due process required setting aside his sentence, remanding that issue to

the circuit court. *See id.* at 186–88. In this case, however, Defendant is not challenging the propriety of the government's changing its theory; he is claiming, in essence, that the new theory is new evidence.

Turning to the claim actually made by Defendant—that Agent Jones's grand-jury testimony is newly discovered evidence—it fails because the testimony (at least as Defendant would use it) is not admissible evidence. It is opinion testimony by Agent Jones. He did not observe any of the brothers participate in the bank robbery or see DeJuan leave the house. Of course, opinion testimony may be admissible in certain circumstances. *See* Fed. R. Evid. 702. And here perhaps Agent Jones's conclusions would be proper expert testimony, because his knowledge and experience enabled him to analyze the cell-phone data and infer how the crime was committed. But Defendant insists that use of the cell-phone data is improper in resolving his motion, thereby removing from consideration any basis for viewing Agent Jones's testimony as admissible expert-opinion evidence. Defendant cannot have it both ways. He cannot argue that Jones's opinion (and only one component of the opinion at that) is newly discovered evidence but that the evidentiary predicate for its admissibility (the cell-phone data and Jones's expertise in analyzing it) cannot be considered. We understand why Defendant wishes to avoid consideration of the cell-phone data and the rest of Jones's opinion. If we consider that evidence, it is obvious that the new evidence would not change the jury's verdict, so he would not be entitled to a new trial. *See Orr*, 692 F.3d at 1099. An analogy may help illuminate what Defendant is arguing here. Say a

12

pathologist concluded from performing a posttrial autopsy that a wound to the decedent's abdomen, while potentially life-threatening, was not the cause of death because another wound sustained at the same time ended the decedent's life first. No court would grant a motion for new trial in which the defendant argued that the pathologist's testimony that the abdominal wound was not the cause of death was new evidence, but that the remainder of the pathologist's observations and analysis could not be considered.

Finally, we note that even if Defendant argues that Jones's testimony would be admissible as impeachment, he cannot prevail. His problem is that neither Jones or anyone else testified at Defendant's trial that there were only two robbers. That proposition was advanced by the prosecutor, but the prosecutor's statements were not evidence. *See United States v. Rogers*, 556 F.3d 1130, 1141 (10th Cir. 2009) (approving of the jury instruction "that closing arguments are not evidence and that Defendant should only be convicted on the basis of evidence submitted at trial"). The witnesses did not express an opinion on the number of robbers; they just reported their observations. And, of course, newly discovered evidence cannot be mere impeachment. *See Orr*, 692 F.3d at 1099.

The district court did not abuse its discretion in denying Defendant's motion for a new trial based on newly discovered evidence.

We AFFIRM the judgment below.